**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **WAYNE MURRELL,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Case No. 4:12-cv-1707 JAR** |
| | ) |
| **ALLSTATE INSURANCE CO., et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

COMES now, Plaintiff Wayne Murrell, by and through his undersigned counsel, pursuant to Federal Rule of Civil Procedure 56(a) and for his Response to the Motion for Summary Judgment of Defendant the Allstate Insurance Company, et al. (hereinafter "Allstate"), states as follows:

Defendant Allstate has moved for Summary Judgment on all five of Plaintiff's counts. Because there are outstanding and unresolved issues of material fact as to all counts, Allstate's motion must be denied.

**STATEMENT OF FACTS**

*I.     Plaintiff's Position*

Allstate hired Plaintiff as a claim adjuster on January 24, 2005 when he was 52 years old. Defendant's Statement of Uncontroverted Facts (hereinafter "DSUF") ¶¶4, 102.  Plaintiff's primary duties included inspecting vehicles and completing property damage estimates in and around St. Louis, Missouri, either in the field or when a vehicle was driven to an Allstate Drive-In claims site. DSUF ¶¶7, 11. His last position with Allstate was Senior Claims Service Adjuster. DSUF ¶4.

1

Plaintiff belonged to Allstate's "V" Unit within the West Central Auto Technical Market Claims Office ("MCO").  DSUF ¶7.  The "V" Unit consisted of 11 claim adjusters from St. Louis and Springfield, Missouri, and reported to Frontline Performance Leader ("FPL") Keith Wangerin.  DSUF ¶¶7-8.  From 2008 through 2012, Wangerin reported to Market Claims Manager ("MCM") David Jenkins.  DSUF ¶9.  At all relevant times, the "V" Unit was part of the Denver Claims Service Area ("CSA"), which included Colorado, Missouri, Kansas, Iowa, and Nebraska. DSUF ¶6.

Allstate classified Plaintiff as a non-exempt hourly employee and was supposed to compensate him at one-and-a-half times his regular rate of pay for any hours worked in excess of forty hours per week.  DSUF ¶¶40-41.  However, Allstate did not keep track of its adjusters' time.  DSUF ¶42. Instead, Allstate instructed Plaintiff to notify Wangerin in advance if they anticipated working more than forty hours in a single workweek. DSUF ¶¶43-44. In theory, Allstate was then supposed to cut Plaintiff's workweek short to make up for the extra time.  In reality, however, Allstate still assigned Plaintiff over forty hours of assignments.

Plaintiff left home to drive to his first estimate at approximately 7:15 AM to 7:30 AM daily.  Plaintiff's Statement of Additional Uncontroverted Material Facts (hereinafter "PSUF"), ¶1.  Plaintiff received his work assignments through Allstate's Workflow Management System ("WFMS" also called the "Gantt Chart") and Allstate dispatchers.  DSUF ¶18.  WFMS assigned and scheduled tasks based on predictions of how long each estimate would take and how long it would take to drive from one estimate to the next.  PSUF ¶2.  The WFMS routinely underestimated driving times.  PSUF ¶3.  Auditors also routinely ran over their scheduled tasks in the WFMS due to total losses.  PSUF ¶4.  If a customer's vehicle ended up being a total loss, the estimate process usually took 2.5 hours as opposed to the scheduled 1 hour.  PSUF ¶5.

Allstate had no way of knowing ahead of time whether a customer's vehicle would be a total loss, so the WFMS schedule could not reflect this extra time.  PSUF ¶6.

Typically, Plaintiff finished with his estimates at approximately 5:30 PM to 6:00 PM. PSUF ¶7.  At the end of each day, Plaintiff received his assigned tasks for the following day. PSUF ¶8.  On Sunday evening, Plaintiff received his assignments for Monday.  PSUF ¶9. Assignments were supposed to be available at 3:00 PM, but if the system was not working correctly, it would be much later.  PSUF ¶10.  After receiving his assignments for the next day, Plaintiff had to call each customer to confirm the appointment and coordinate the details.  PSUF ¶11.  Allstate's Nexgen system records reflect the time of these phone calls.  PSUF ¶12.

Including time spent driving to estimates and these evening calls, Plaintiff averaged 10 hours of work per day, or 50 hours per week.  PSUF ¶13.  Plaintiff regularly reported these extra hours to Wangerin.  PSUF ¶14.  Wangerin told Plaintiff that he was not authorized to pay for overtime, that extra hours were just "part of the job."  PSUF ¶15.  Every adjuster in the unit complained to Wangerin about the extra hours required of them.  PSUF ¶16.  However, Allstate policy required adjusters to complete every assigned estimate, regardless of how long it actually took to perform them.  PSUF ¶17.

Allstate did authorize Wangerin to approve overtime in certain preapproved circumstances, such as when a catastrophic hail storm caused widespread damage.  PSUF ¶18. Allstate did pay Plaintiff for overtime hours on those occasions. DSUF ¶¶53-54.  However, Wangerin never approved the run-of-the-mill overtime that Plaintiff had to work week-in and week-out in order to complete his assigned tasks.   PSUF ¶18.

II.     *Allstate's Policy to Discourage Customer's from Fixing their Vehicles*

When Plaintiff performed estimates in the field (i.e., somewhere other than an Allstate

Drive-In facility), he would meet with the customer, inspect the vehicle, prepare the estimate, and explain it to the customer.  DSUF ¶20.  Plaintiff would document the estimate by entering information into Allstate's estimating software.  DSUF ¶11.  To complete the estimate, Plaintiff used part prices from carparts.com, a database where parts vendors list their prices.  Allstate demanded that its adjusters always base the estimate on the lowest part price on carparts.com, regardless of where that part was located.  PSUF ¶19.  The estimate did not include the cost to ship the part. PSUF ¶20.  If a local supplier did not meet the lower out-of-state price, then the original check would require a supplemental check to cover the shipping cost or the higher local price.  PSUF ¶21.  If the customer was discouraged and did not request a supplement, then Allstate came out of the claim without having to pay for the full cost of repair. PSUF ¶22.

### III.     Plaintiff's termination

When using Allstate's estimating software, Plaintiff had to identify the "Inspection Type" from a drop-down menu of options which included "Drive-In," "Field," and "Unknown." DSUF ¶¶68-70.  Allstate's computer systems randomly generated customer satisfaction surveys for a percentage of inspections marked "Drive-In" (i.e., the inspection took place at an Allstate facility) or "Field" (i.e., off of Allstate's premises). DSUF ¶69.  The system did not generate surveys for inspections marked "Unknown."  DSUF ¶71. Customer satisfaction counted for 50% of Plaintiff's annual Performance Plan. DSUF ¶64.

In January 2011, Plaintiff attended the annual kickoff meeting for the Denver CSA, held in Kansas City.  PSUF ¶23.  At that meeting, Allstate manager Wendy Hargrove told Plaintiff and the other adjusters that it was appropriate to use "unknown" with their supervisor's permission when the customer was especially irate at Allstate prior to the estimate.  PSUF ¶24.  Hargrove explained that this was to avoid sending a survey to someone who would give a negative survey

for reasons unrelated to the adjuster's service.  PSUF ¶25.

In September 2011, Allstate identified Plaintiff's unit for its use of "unknown." Wangerin, after discussing the issue with Jenkins, sent an email to Plaintiff and his coworkers, reminding them to only use "unknown" with his prior approval. DSUF ¶81.  Allstate singled out Plaintiff and five other adjusters in his unit for investigation.  At the time, Plaintiff was 59 years old at the time.  DSUF ¶102.  The other selected adjusters were 49, 53, 57, 57, and 58.  DSUF ¶103.  On November 8, 2011, Allstate Corporate Security Investigator Ed Mosterd interviewed Plaintiff via videoconference. DSUF ¶91. During the interview, Plaintiff told Mosterd about the directions he received regarding "unknown," and how he followed them.  PSUF ¶26.  Allstate terminated Plaintiff, the five other adjusters, and Wangerin on January 4, 2012.  DSUF ¶101.

IV.    *Allstate's defamation of Plaintiff*

After Allstate terminated Plaintiff and the other adjusters, Jenkins told other Allstate employees that Plaintiff had been terminated for "falsifying records."  PSUF ¶27.  Allstate employees then republished Jenkins' statement through the industry by telling repair shops throughout the St. Louis area. PSUF ¶28. As a result, Plaintiff suffered reputational damage, and was unable to find a new job for some months, resulting in lost income.  PSUF ¶29.

## PROCEDURAL HISTORY

On April 27, 2012, Plaintiff filed a charge with the Missouri Commission on Human Rights alleging a single claim of age discrimination against Allstate.  DSUF ¶113. After receiving his right to sue letter, Plaintiff filed the instant lawsuit in state court alleging age discrimination under the Missouri Human Rights Act (the "MHRA") as well as unpaid overtime under the Missouri Minimum Wage Law.  Allstate removed the action to federal court based on diversity of citizenship. (Dkt. 1.)  On February 19, 2013, Plaintiff filed an Amended Complaint

adding claims for unpaid overtime under the Fair Labor Standards Act, 29 USC §201, et seq., wrongful termination contrary to public policy, and defamation. (Dkt. 29.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is only proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. See Rule 56(c)(2). The moving party bears the responsibility of informing the court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir.2011) (en banc). The non-movant must come forward with some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Id*. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 251–52.

## ARGUMENT

I.    *Defendant is not entitled to summary judgment as to Count I and III of Plaintiff's Amended Petition because the evidence produced in discovery shows that Plaintiff worked in excess of 40 hours per week.*

Allstate now claims that it is entitled to summary judgment on Plaintiff's overtime claims because Plaintiff has not met his evidentiary burden. Quite the opposite. Plaintiff has produced multiple types of unrefuted evidence showing that he worked uncompensated overtime. As such, Allstate's arguments must fail. 29 U.S.C. §207(a) provides:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of

6

goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

Thus, to state a claim under this section, the plaintiff must at least show that he (1) was an employee eligible for overtime compensation, (2) he worked more than forty hours in one workweek, and (3) that he did not receive compensation at one and one-half times the regular rate.  Here, Allstate disputes only the second element.

Allstate is correct that "an employee who brings suit ... for unpaid minimum wages ... has the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946).  However, the problem arises in cases such as this where the employer has not maintained accurate records of the employee's time worked.  *Id.* at 687.  In such cases, as the 8th Circuit has observed:

> [I]t is the employer who is charged with the duty of record-keeping so that the amount of work performed and compensation earned may be calculated with precision. An employer failing to comply with this duty cannot complain if the record is deficient and the court must resort to a reasonable approximation in computing the amount of damages awarded.

*Donovan v. Tony and Susan Alamo Foundation*, 722 F. 2d 397, 403-04 (8th Cir. 1987).  As the U.S. Supreme Court has made clear from early on, the proper remedy where the accuracy of time records is in question is to construe them against the employer, the creator and custodian of the records, not to penalize the employee.  *Id.*, quoting *Mt. Clemens Pottery*, 328 U.S. at 687.

Thus, the FLSA implements a burden shifting analysis: the employee must carry produce sufficient evidence to show the amount and extent of that work as a matter of "just and reasonable inference."  *Mt. Clemens Pottery*, 328 U.S. at 687. The burden then

shifts to the employer to produce evidence of the precise amount of work performed or

negative the reasonableness of the inference to be drawn from the employee's evidence.

*Id*. at 687–88.

Allstate has not and cannot produce any evidence to refute the evidence of unpaid

overtime for these extended days.  Rule 56 and *Torgerson* require the defendant to submit

evidence of specific facts refuting the plaintiff's evidence, or summary judgment is

inappropriate.  643 F.3d at 1042.

Of the four former Allstate employees deposed, all stated that the adjuster job required

working hours in excess of forty every week.  PSUF ¶16.  Each employee testified that adjusters

had to work several hours each Sunday evening after receiving Monday's work assignments

from the WFMS in order to arrange meetings with those customers for the following day.  PSUF

¶¶9, 11, 16.  Weeknights required the same extra work.  The records from Allstate's Nexgen

system will confirm this fact.  PSUF ¶12.

Further, as established by testimony, the WFMS regularly underestimated the time

required to perform each assessment.  PSUF ¶3.  It never provided enough driving time to get

from appointment to appointment, forcing the adjuster to run behind in the schedule and causing

the day to run long.  PSUF ¶2.  Further, and more significantly, the WFMS and Allstate generally

had no way of knowing in advance whether any of the estimates for that day would result in a

total loss for the customer's vehicle.  PSUF ¶4.  Those estimates took significantly longer,

sometimes one and a half hours longer, than the time the system allotted for the adjuster to deal

with that customer's claim.  PSUF ¶5.  As a result, the adjuster's workday ran even longer than

scheduled, often by several hours.

Secondly, the evidence produced demonstrates that Plaintiff was not paid for the additional hours worked.  Wangerin had to approve all overtime work in order for the adjusters to get paid for it.  PSUF ¶18.  Yet, he was only authorized to do so in certain preapproved circumstances, such as when a catastrophic hail storm caused widespread damage.  PSUF ¶18. Wangerin never approved the run-of-the-mill overtime that Plaintiff had to work week-in and week-out in order to complete his assigned tasks.

Finally, Plaintiff had provided evidence of the amount of hours for which he deserves additional compensation via affidavit, and Allstate can produce no evidence to refute it.  As established by Wangerin's deposition testimony, Allstate made no attempt to record and document the amount of hours any of its adjusters, including Plaintiff, actually worked, despite the fact that Plaintiff regularly told Wangerin about them at staff meetings.  PSUF ¶14.

Under the burden shifting analysis laid out in *Mt. Clemens* and *Donovan*, Allstate now bears the burden to produce some evidence refuting Murrell's claimed hours.  It has not and can not, because by its own admission it maintained no such records.  Because the evidence must be construed in Plaintiff's favor as the non-moving party, summary judgment is inappropriate.

II.    *Defendant is not entitled to Summary Judgment on Count II – Violations of the Missouri Human Rights Act.*

Next, Allstate asserts that it is entitled to Summary Judgment as to Plaintiff's claims for violations of the Missouri Human Rights Act (hereinafter "MHRA") for age discrimination.  The evidence produced in discovery, however, demonstrates that Plaintiff has established a prima facie case of age discrimination and there are unresolved issues of material fact that make judgment as a matter of law inappropriate.

Under the MHRA, a plaintiff need not prove that age discrimination was the sole cause of his termination; he need only show that there is a genuine issue of material fact as to whether age

9

was a 'contributing factor' in the employer's termination decision. Mo. Rev. Stat. § 213.010, et

seq.; *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 820-21 (Mo. 2007).

Claims for discrimination under the Missouri Human Rights Act can survive summary judgment

if there is a genuine issue of material fact as to whether the protected status was a "contributing

factor" in the employer's termination decision. *Daugherty v. City of Maryland Heights*,  231

S.W.3d 814, 820 (Mo. 2007).    The discrimination need not be a substantial or determining

factor in the challenged employment action. *Stanley v. JerDen Foods, Inc*., 263 S.W.3d 800, 803

(Mo.App. W.D. 2008).  The plaintiff can prove discrimination by showing any protected

characteristic was a contributing factor for the employment action "regardless if other factors

also exist."  Id. at 803-4.  Retaliation for opposing discrimination or for filing a complaint

constitutes discrimination under the MHRA and, like other forms of discrimination, is proved by

showing the elements required by the MHRA, rather than by reference to cases such as

McDonnell Douglas analyzing violations of federal law. *Hill v. Ford Motor Co.,* 277 S.W.3d 659,

665 (Mo.,2009).  To the extent Missouri cases decided prior to Daugherty suggest to the contrary,

they are not to be followed. *Id.*

When determining the scope of Missouri law, Federal courts are bound by the decisions

of the Supreme Court of Missouri. *Eubank v. Kansas City Power & Light Co.*, 626 F. 3d 424, 427

(8th Circuit 2010). If the Supreme Court of Missouri has not addressed an issue, federal courts

must predict how the court would rule, and they follow decisions from the intermediate state

courts when they are the best evidence of Missouri law. *Id.*

Defendant argues that the court must apply the McDonnell-Douglas burden shifting

analysis, however, this is an inappropriate analysis for cases brought under the MHRA. *Hill at*

*655.* Assuming arguendo that the court applies the burden shifting analysis, defendant's argument still fails.

Here, the facts demonstrate that Plaintiff has met his burden to establish a prima facie case under the *McDonnell-Douglas* framework. The first and third elements are uncontested. (1) Plaintiff was 59 years old at the time of his termination, and (3) Plaintiff suffered an adverse employment action in that he was terminated. It is also apparent that Plaintiff met the fourth element, in that he was treated less favorably than younger employees. In addition to Plaintiff (59 years old at termination), the other terminated adjusters were 49, 53, 57, 57, and 58 respectively. DSUF ¶103. The adjusters hired to replace them were 31, 40, 41, 44 and 46. DSUF ¶107. The only issue at hand then, is whether Plaintiff was otherwise qualified to perform his assigned tasks. This element is intertwined with the issue of pretext.

Plaintiff performed all of his tasks as assigned. At the January 2011 annual kickoff meeting in Kansas City, Hargrove (a much higher person in Allstate's organization) told Plaintiff and the other adjusters that it was appropriate to use "unknown" with their supervisor's permission when the customer was especially irate at Allstate prior to the estimate. Pl. Dep. PSUF ¶¶23-25. Wangerin also told his adjusters to do so. DSUF ¶81. By using "unknown," Plaintiff was only acting in accordance with the instructions he received from his superiors. Plaintiff only used "unknown" in the approved circumstances, and always with Wangerin's approval, as Allstate's procedures demanded. PSUF ¶26. Allstate, in its motion, makes no assertion that Plaintiff used "unknown" without supervisor approval, or that he used it in other circumstances than it intended. Further, Allstate makes no argument that Plaintiff was fired for any other reason, or that he was incapable of performing his job at the level it required. As such, Plaintiff was never subjected to any disciplinary action prior to his termination.

At the summary judgment stage, Plaintiff is entitled to the benefit of every inference the record affords.  The evidence demonstrates that Plaintiff adhered to the instructions given by his superiors.  As such, Plaintiff has made a prima facie showing that he was otherwise qualified to perform the tasks assigned, and that his termination was the result of a pretext for age discrimination.

In *Johnson*, the Eighth Circuit held that material issues of fact prohibited summary judgment where an employee asserted he was following his supervisor's instructions.  In that case, a security company fired a guard.  728 F.3d at 756-57.  The company's claimed justification was that the guard failed to immediately report his car accident, and that the guard left work an hour early.  *Id.*  The guard, however, testified that he was only following instructions: he tried to report the accident right away but could not get ahold of anyone, and when he finally did speak to his supervisor, but men agreed on a mistaken time for the end of the guard's shift.  *Id.* at 756.  Further, the guard presented other evidence that younger employees were treated more favorably in similar circumstances. *Id.* at 757-58.  The Court denied summary judgment.  *Id.* at 761.  It reasoned that whether the guard was actually acting on directions from his supervisor was a material issue of fact.  *Id.*  That issue of fact was relevant to determining whether the company's stated reasons were a pretext for age discrimination.  *Id.* Further, because the guard was the nonmoving party, the Court was obligated to afford him the benefit of every inference that the facts allowed.  *Id.*

The circumstances here are identical to the guard's termination in *Johnson*.  Just as the security company attempted to justify the guard's termination by claiming he left his shift early, Allstate here claims that Plaintiff violated its rules on the use of "unknown."  However, in both cases, the employee merely acted in accordance with his supervisor's direct instructions.  The

guard and his supervisor agreed on the earlier time to end his shift.  Plaintiff merely followed Wangerin's instructions on when to use "unknown."  In fact, Plaintiff's case is even stronger, because his directions went beyond just Wangerin, his immediate supervisor, to the annual kickoff meeting, where Allstate's higher management told Plaintiff and all of his coworkers how and when to use unknown.  *Johnson* thus informs the outcome of this case in two ways: (1) where the employer's written procedures and its supervisors' instructions differ, an employer cannot rely on the written violation to support a termination without giving rise to an inference of pretext.  (2) Where the employee presents other evidence of younger employees receiving disparate treatment, as is the case here, the true motivation for termination is an issue of fact to be determined by a jury.

Because Plaintiff has presented a prima facie case for age discrimination and there are outstanding issues of fact as to whether Allstate's stated motivation was pretextual, summary judgment must be denied.

III. *Defendant is not entitled to Summary Judgment on Count IV – Wrongful Termination in Violation of Public Policy, because there are unresolved issues of material fact as to whether Allstate's stated reasons for termination were pretextual.*

Although the general rule in Missouri is that an at-will employee may be terminated for any reason or no reason, the at-will-employment doctrine is not static. *Fleshner v. Pepose Vision Institute, P.C.*, 304 S.W.3d 81, 92 (Mo. 2010).  It may be modified directly by or through public policy reflected in the constitution, a statute, a regulation promulgated pursuant to statute, or a rule created by a governmental body.  *Id*.  To find otherwise would allow employers to discharge employees, without consequence, for doing that which is beneficial to society.  *Id*.  For this reason, the Missouri Supreme Court has expressly adopted the following as the public-policy exception to the at-will employment doctrine.  *Id*.  There are four categories of public policy

exception cases: (1) discharge of an employee because of his or her refusal to perform an illegal act; (2) discharge of employee because he or she reported a violation of law or public policy by their employers or fellow employees; (3) discharge of employee for actions which sound public policy would encourage; i.e., acceptance of jury duty position and seeking public office; and, (4) discharge of employee for filing a worker's compensation claim. *Clark v. Beverly Enterprises–Missouri,* 872 S.W.2d 522, 525 (Mo.App. W.D.1994).  If an employer terminates an employee for any of these reasons, then the employee has a cause of action in tort for wrongful discharge based on the public-policy exception. *Fleshner*, 304 S.W.3d at 92.  Plaintiff's claim falls under the first categories.

To prevail on a claim under this exception, a plaintiff must establish that: (1) he refused to violate the law or a well-established and clear mandate of public policy, *or* reported such a violation to a superior or public authority; (2) the employer terminated his employment; (3) his refusal or report was a contributing factor in his termination; and (4) as a result of his discharge, he sustained damages. *Keveney v. Missouri Military Academy*, 304 S.W.3d 98, 103 (Mo. 2010). Plaintiff has a right to action if her protected activity was a "contributing factor" in the employer's decision to terminate her.  *Fleshner* 304 S.W.3d at 95.

Defendant is correct to cite *Margiotta v. Christian Hosp. NE NW* for the proposition that a wrongful discharge action must be based on a constitutional provision, a statute, a regulation based on a statute or a rule promulgated by a governmental body.  315 S.W.3d 342, 346 (Mo. banc 2010).  The employee is not required to prove an actual violation of law; however, he or she must cite some legal authority for the belief that the employer or coworker's conduct was unlawful or contrary to a clear mandate of public policy.  *Kelly v. Bass Pro Outdoor World, LLC*, 245 S.W.3d 841, 849 (Mo.App. E.D., 2007).  An employee only needs to have a reasonable

belief that a crime had been committed.  *Id.* Whether the violation results in civil fines, injunctions, or disciplinary action against a professional license is immaterial to the wrongful discharge action. *Margiotta v. Christian Hosp. Northeast Northwest* , 315 S.W.3d 342, 347 (Mo.,2010.)

The violations need not affect the employee personally, nor must law violated prohibit or penalize retaliation against those reporting its violation.  *Fleshner v. Pepose Vision Institute, P.C.*, 304 S.W.3d 81, 97 (Mo. 2010).  The only pertinent inquiry is whether the authority clearly prohibits the conduct at issue.  *Margiotta*, 315 S.W.3d at 347.  Finally, the authority must impose a positive duty on the employer.  *Boyle v. Vista Eyewear, Inc*., 700 S.W.2d 859, 877 (Mo. App. W.D. 1985).

The Amended petition asserts that Plaintiff reasonably believed that Allstate's conduct violated the following provisions: §§ 375.445, 375.144, 570.140, and 570.160 R.S.Mo and C.S.R. §§ 100-1.010-300.

§375.445 R.S.Mo prohibits insurers from acting fraudulently and requires them to perform their duties until their contracts in good faith.  It provides, in relevant part:

> 1. It is unlawful for any insurance company transacting business under the laws of this state to:
> (1) Conduct its business fraudulently;
> (2) Fail to carry out its contracts in good faith; or
> (3) Habitually and as a matter of business practice compelling claimants under policies or liability judgment creditors of the insured to either accept less than the amount due under the terms of the policy or resort to litigation against the company to secure payment of the amount due.

§375.144 R.S.Mo prohibits insurers from using deceptive practices and making misrepresentations of material fact in connection with their sales and negotiations.  It provides, in relevant part:

It is unlawful for any person, in connection with the offer, sale, solicitation or negotiation of insurance, directly or indirectly, to:
(1) Employ any deception, device, scheme, or artifice to defraud;
(2) As to any material fact, make or use any misrepresentation, concealment, or suppression;
(3) Engage in any pattern or practice of making any false statement of material fact; or
(4) Engage in any act, practice, or course of business which operates as a fraud or deceit upon any person.

§570.140 R.S.Mo is a criminal statute that makes it illegal to use or possess false weights or measures, or to sell a less than represented quantity of service.  It provides, in relevant part:

1. A person commits the crime of deceptive business practice if in the course of engaging in a business, occupation or profession, he recklessly
(1) Uses or possesses for use a false weight or measure, or any other device for falsely determining or recording any quality or quantity; or
(2) Sells, offers or exposes for sale, or delivers less than the represented quantity of any commodity or service; or
(3) Takes or attempts to take more than the represented quantity of any commodity or service when as buyer he furnishes the weight or measure; or
(4) Sells, offers or exposes for sale adulterated or mislabeled commodities; or
(5) Makes a false or misleading written statement for the purpose of obtaining property or credit.

§570.160 R.S.Mo is also a criminal statute that criminalizes false advertising of property or services.  It provides, in relevant part:

1. A person commits the crime of false advertising if, in connection with the promotion of the sale of, or to increase the consumption of, property or services, he recklessly makes or causes to be made a false or misleading statement in any advertisement addressed to the public or to a substantial number of persons.

In addition to statutory law, the Missouri Department of Insurance, Financial Institutions and Professional Registration also regulates insurers.  It has promulgated several regulations that prohibited Allstate's conduct here, specifically in 20 CSR §100-1.050, Standards for Prompt, Fair and Equitable Settlement of Claims.  That section provides, in relevant part:

(2) Standards for Prompt, Fair and Equitable Settlements Applicable to Automobile Insurance.

16

…
(D) Estimates.
1. If an insurer prepares an estimate of the cost of automobile repairs, the estimate shall be in an amount for which it may be reasonably expected the damages can be satisfactorily repaired.
…
(F) When the insurer elects to repair and designates a specific repair shop for automobile repairs, the insurer shall cause the damaged automobile to be restored to its condition prior to the loss at no additional cost to the claimant other than as stated in the policy and within a reasonable period of time.
(G) The insurer shall not use as a basis for cash settlement with a first-party claimant an amount which is less than the amount which the insurer would pay if repairs were made, other than in total loss situations, unless the amount is agreed to by the insured.

These laws and regulations impose a positive duty on insurers.  They mandate certain behaviors in how insurers advertise their services and perform their contractual duties.  They mandate timeliness, good faith, and payment in full.  As alleged, Allstate's behavior violated the terms of these laws and regulations.

Here, the Amended Complaint asserts that Allstate purposefully undervalued its estimates in order to discourage customers from getting the repairs to which they were entitled.  When Plaintiff performed estimates in the field, he would document the estimate by entering information into Allstate's estimating software.  DSUF ¶11.  To complete the estimate, Plaintiff used part prices from carparts.com, a database where parts vendors list their prices.  Allstate demanded that its adjusters always base the estimate on the lowest part price on carparts.com, regardless of where that part was located.  PSUF ¶19.  The estimate did not include the cost to ship the part. PSUF ¶20.  If a local supplier did not meet the lower out-of-state price, then the original check would require a supplemental check to cover the shipping cost.  PSUF ¶21.  If the customer was discouraged and did not request a supplement, then Allstate came out of the claim without having to pay for the full cost of repair. PSUF ¶22.

17

Allstate's scheme clearly violated every one of the cited provisions.  First, the undervalue scheme violated Missouri insurance law.  §375.445 R.S.Mo, because Allstate did not perform its contractual duties in good faith.  Allstate knew that the real cost to repair the customer's vehicle would exceed the amount of the initial estimate when shipping was included, but it nonetheless paid out the lower amount, all in an effort to avoid the full cost of its contractual obligation.  Allstate forced its customers to badger it for a supplemental check in order to receive the amount for which they were owed by contract.  That was an act of bad faith.  Next, Allstate violated §375.144 R.S.Mo by making a misrepresentation of material fact.  When it undervalued an estimate, Allstate represented to the customer that its estimate would cover the repair.  It did not.  Again, the actual amount was often much higher, and required the customer to seek a supplement.

Second, Plaintiff believed that Allstate's conduct violated Missouri criminal law.  Plaintiff believed that the undervalue scheme violated §570.140 R.S.Mo because Allstate represented in its agreements with customers that it would cover the entire cost of the repair, but by undervaluing the initial estimate, Allstate delivered less than the promised amount of service.  Further, Plaintiff believed that Allstate violated §570.160 R.S.Mo, for falsely advertising the extent of its services to customers.

Finally, Allstate's conduct violated Missouri insurance regulations, specifically 20 CSR §100-1.050.  The undervaluing scheme violated subsection (2)(D)(1), which requires the estimate to be in an amount for which it may be reasonably expected the damages can be satisfactorily repaired.  Allstate knew that its initial estimates would not cover the repair cost due to shipping.  Also, Allstate's conduct violated subsections (F) and (G), because it did not return the vehicle to its pre-loss condition (or pay the equivalent cash amount) without further loss to

18

the customer.  The customer had to expend his or her time and effort to hound Allstate for the supplement, which Allstate always knew would be necessary.

In the landmark case *Boyle*, the Missouri Court of Appeals for the Western District allowed recovery for wrongful termination where an employee reported violations of administrative regulations.  In that case, the United States Food and Drug Administration ("FDA") promulgated regulations requiring all eyeglass manufacturers to test lenses for breaking and shattering before they could be sold.  *Id*. at 861.  The employer did not comply with this regulation. *Id*.  The employee complained to her superiors, and then when ignored, reported the violations to the FDA.  Her employer then terminated her.  *Id.*

The Court found the public policy exception warranted.  *Id.* at 877.  It reasoned that the FDA regulation was a clear mandate of public policy designed to ensure public safety.  *Id*. at 876.  Also, the regulation must impose a clear and positive duty on manufacturers, which the FDA regulation did.  *Id* at 877.

The laws and regulations in question here are analogous to the regulations in *Boyle*, in that they impose an affirmative course of conduct, a positive duty, on the employer.  Like the eyeglass safety regulations in *Boyle*, the Missouri insurance code and criminal law inform insurers of specifically mandated and prohibited conduct.  That is, these laws and regulations inform insurers that they must pay their contracted amounts promptly, in full, and in good faith.  To that end, they function as a clear mandate of public policy, specifically designed to ensure that insurance customers receive the benefit of their insurance contracts they enter.  Under these circumstances, the

Further, the public policy exception is clear on the point that the employee may report his employer's wrongful conduct either to the proper regulatory authority *or* to someone up the

chain of command in the employer's own organization. *Bennartz v. City of Columbia*, 300 S.W.3d 251, 257 (Mo.App. W.D. 2009). The evidence produced at deposition shows that Plaintiff repeatedly complained of Allstate's policies to Wangerin and Jerry DeGrendele. DSUF ¶123.

 Given that Allstate's conduct properly invoked serious mandates of public policy and that Plaintiff reported those violations to his superiors, there are unresolved issues of material fact as to whether Allstate's stated reasons for termination were pretextual, or a result of retaliation. As such, Allstate's motion for summary judgment must be denied.

 *IV.* *Defendant is not entitled to Summary Judgment on Count V – Defamation.*

 To state a prima facie defamation claim, Plaintiff must establish: (1) the publication (2) of a defamatory statement, (3) identifying Plaintiff, (4) that is false, (5) and published with a requisite degree of fault, (6) caused actual damages to Plaintiff's reputation. *Ruzicka Elec. & Sons, Inc. v. IBEW, Local 1*, 427 F.3d 511, 522 (8th Cir. 2005). The requisite degree of fault for a private figure such as plaintiff is negligence. *Overcast v. Billings Mutual Ins. Co.*, 11 S.W.3d 62, 70 (Mo. 2000).

 After Allstate terminated Plaintiff and the other adjusters, Jenkins told other Allstate employees that Plaintiff had been terminated for "falsifying records." PSUF ¶27. Allstate employees then republished Jenkins' statement through the industry by telling repair shops throughout the St. Louis area. PSUF ¶28. For example, Allstate adjuster Steve Trussell told repair shops that Plaintiff was to receive a large settlement in conjunction with a lawsuit against Allstate. PSUF ¶30. As a result, Plaintiff testified that performing his job became much more difficult – repair shops assumed Plaintiff did not need to care about his work and therefore did not need to negotiate as hard. PSUF ¶29.

These circumstances establish all of the prima facie elements of a defamation claim.  (1) Jenkins published Plaintiff's termination and so-called "falsification" of documents, and Trussell republished the allegations and the imaginary settlement amount.  (2) The statement was defamatory in that it asserted that Plaintiff was an untrustworthy person and incapable of performing his job, a classic defamation category.  (3) The statements identified Plaintiff by name.  (4) The statement was false: Plaintiff only followed direct instructions from his superiors regarding the use of "unknown."  He never falsified anything.  Also, there was never any such settlement value.

Element (6) was satisfied, because Plaintiff presented evidence that performing his daily job is now more difficult, as repair shops do not take him seriously in negotiating prices.

Element (5), the requisite degree of fault, is more complex, but must be resolved in Plaintiff's favor at this stage in the litigation.  As indicated supra, because Plaintiff is a private figure, the requisite degree of fault is negligence.  This is the lowest threshold possible for a defamation claim.  Public figures require a showing of actual malice. *Bauer v. 7-Eleven, Inc.*, 391 S.W.3d 25, 28 (Mo. App. E.D. 2012).  The motivation for Jenkins statements is an issue of fact that cannot be resolved as a matter of law.  As such, the issue is not ripe for summary judgment.  Further, the inferences available from the record, which must be resolved in Plaintiff's benefit, demonstrate that Jenkins acted out of malice.  Contrary to Allstate's contentions, Jenkins had no reason to inform any other Allstate employees its purported reasoning for Plaintiff's termination.  For Jenkins to say that Plaintiff falsified documents could only be out of spite.  Trussell's republication affords the same inference.  Trussell had absolutely no reason to discuss Plaintiff's termination or the imaginary settlement value with repair shops other than malice.

21

Allstate's qualified privilege claim must also fail for this reason.  The qualified privilege

doctrine is an affirmative defense to a defamation cause of action.  As the Missouri Supreme

Court has observed:

> A communication is held to be qualifiedly privileged when it is *made in good
> faith* upon any subject-matter in which the person making a communication
> has an interest or in reference to which he has a duty, and to a person having a
> corresponding interest or duty, although it contains matter which, without such
> privilege, would be actionable.

*Carter v. Willert Home Products. Inc.*, 714 S.W.2d 506, 513 (Mo. 1996)(emphasis added).  The

statement must therefore be made in good faith.  Neither Jenkins nor Trussell had any cause to

make the statements they did, and could only have done so out of malice.  As such, the defense

does not apply to these circumstances.

Because Plaintiff has stated a prima facie cause of action for defamation and because

there are outstanding unresolved questions of material fact at issue, Allstate's motion for

summary judgment must be denied.

## CONCLUSION

The facts in the record, when construed in the light most favorable to the Plaintiff,

demonstrate that there are material disputes at issue that must be resolved by the trier of fact at

trial.

WHEREFORE Plaintiff moves this Court to enter an order denying Defendant's Motion

for Summary Judgment and for any further relief this court deems proper and just under the

circumstances.


Respectfully submitted:


KASPER LAW FIRM, LLC

By:  /s/ Kevin J. Kasper
Kevin J. Kasper, No. 52171MO
3930 Old Hwy 94 South, Suite 108
St. Charles, MO 63304
Ph: 636-922-7100
Fax: 866-303-2874
Email: kevinkasper@kasperlawfirm.com
Attorney for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of the foregoing was served via the electronic filing system on February 12, 2014 to:

LITTLER MENDELSON
Harry W. Wellford, Jr.
Patricia J. Martin
One Metropolitan Square
211 North Broadway, Suite1500
St. Louis, MO 63102

MECKLER BULGER TILSON MARICK & PEARSON LLP
Peter Petrakis
Amanda Suchecki
123 North Wacker Drive, Suite 1800
Chicao, IL 60606

Attorneys for Defendant Allstate Insurance Company

/s/ Kevin J. Kasper