|  |  |  |
|---|---|---|
| WAYNE MURRELL, | ) ) ) | |
| Plaintiff, | ) ) | No. 4:12-CV-1707 JAR |
| v. | ) ) | |
| ALLSTATE INSURANCE COMPANY, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the court on Defendant's Motion for Summary Judgment (ECF No. 52), Plaintiff's Motion for Partial Summary Judgment (ECF No. 56), and Defendant's Motion to Strike Plaintiff's Affidavit in Support of His Motion for Summary Judgment (ECF No. 64). These matters are fully briefed and ready for disposition.

## BACKGROUND

A.  Plaintiff's Employment with Allstate

Plaintiff Wayne Murrell ("Murrell") was an at-will, employee of Allstate Insurance Company ("Allstate") from January 24, 2005 to January 5, 2012, and held the position of Senior Claims Service Adjuster at the time of his termination.  (Statement of Uncontroverted Material Facts in Support of Defendant's Motion for Summary Judgment ("DSUMF"), ECF No. 53, ¶¶4, 58); Plaintiff's Statement of Uncontroverted Material Facts in Support of His Motion for Partial Summary Judgment ("PSUMF"), ECF No. 57, ¶1).  Murrell reported to the Kansas City Market Claims Office from 2005 until approximately 2009.  (DSUMF, ¶5).  In 2009, Murrell became part of the Denver Claims Service Area, which included Colorado, Missouri, Kansas, Iowa, and

Nebraska—and began reporting to the Denver Market Claims Office. (DSUMF, ¶6). Murrell belonged to the Missouri Auto Unit-V, which consisted of 11 claim adjusters from St. Louis and Springfield, Missouri. (DSUMF, ¶7). Adjusters in Unit-V, including Murrell, reported to Frontline Performance Leader ("FPK") Keith Wangerin ("Wangerin") who was Murrell's supervisor for the duration of his employment. (DSUMF, ¶ 8). From 2008 through 2012, the duration of Murrell's employment in Unit-V, Wangerin reported to Market Claims Manager ("MCM") David Jenkins. (DSUMF, ¶9).

Murrell, as an adjuster, was responsible for, among other things, evaluating automobile claims; assessing the value of the claim and negotiating a settlement; meeting goals related to customer satisfaction; complying with claims practices and procedures; completing estimates accurately and in a timely manner; and accurately assessing a vehicle's total loss value. (DSUMF, ¶10). Murrell's duties included completing vehicle property damage estimates in and around St. Louis, Missouri, either in the field or at an Allstate drive-in facility and documenting estimates by entering information into Allstate's computer system. (DSUMF, ¶11; PSUMF, ¶3). A field estimate occurs at a specific location in the field and requires the adjuster to travel to that location to conduct the estimate. (DSUMF, ¶12; PSUMF, ¶5). Murrell primarily worked in the field, but would occasionally fill in for other adjusters at a designated Allstate drive-in facility, which was staffed by an Allstate adjuster. (DSUMF, ¶¶13, 14; PSUMF, ¶4). When assigned to work in the field, Murrell would receive and download his scheduled assignments the day before through Allstate's computerized dispatch system, or Workflow Management System ("WFMS") (also called the Gantt chart). (DSUMF, ¶¶15-16; PSUMF, ¶7). The Gantt chart documented scheduled arrival and departure times as well as actual arrival and departure times. (DSUMF, ¶18; PSUMF, ¶18). The Gantt chart assigned and scheduled tasks based on predictions of how

long each estimate would take and how long it would take to drive from one estimate to the next. (PSUMF, ¶8).

At each field inspection, Murrell would meet with the customer, inspect the vehicle, prepare the estimate and, upon completion, explain the estimate to the customer. (DSUMF, ¶20). Murrell would not know until the process of inspecting the vehicle was completed whether the insured would receive a check from Allstate for the cost of the repairs. (DSUMF, ¶21). Adjusters were supposed to rely on a script when interacting with customers. (DSUMF, ¶22). The script included items to be discussed including the insured's deductible, the selection of a repair shop, and the potential for a supplement estimate. (DSUMF, ¶23). Each insured policy includes a provision that limits Allstate's liability: "Allstate's limit of liability is the least of: 1) the actual cash value of the property or damaged part of the property at the time of the loss, which may include a deduction for depreciation; or 2) the cost to repair or replace the property or part to its physical condition at the time of loss using parts produced by or for the vehicle's manufacturer, or parts from other sources, including, but not limited to, non-original equipment manufacturers as permitted by state laws and regulations …." (DSUMF, 24). Under Allstate's policy, adjusters are trained to write the estimate based upon the "best-case scenario" (meaning based upon the assumption that the part can be repaired, rather than replaced); and are required to use alternative parts when replacement of the part is necessary (meaning that new parts are to be used only if alternative options have been exhausted). (DSUMF, ¶25). Murrell contends that Allstate required that, to complete the estimate, adjusters always used part pieces from carports.com, a database where parts vendors list their prices, regardless of where the part was located. (PSUMF, ¶19). Murrell asserts that the estimate Allstate provided to the customer, however, did not include the cost of shipping the part if it was located out of state. (PSUMF,

¶20). If a local supplier did not meet the lower out-of-state price, then the customer would have to request a supplemental check to cover the shipping cost or the higher local price. (PSUMF, ¶21). A supplement estimate is an estimate that is prepared for additional repairs found during the course of the repair that was not included on the original estimate. (DSUMF, ¶29). In the event that additional damage or costs are discovered during the repair process or if the part could not be repaired, then a supplement estimate is prepared to cover the additional damages. (DSUMF, ¶30). Even if an adjuster undervalues the repairs, Allstate is still responsible for the actual cost of the parts and repairs. (DSUMF, ¶30). Murrell, however, maintains that if the customer does not request a supplement, then Allstate comes "out ahead without having to pay for the full cost of repair. (PSUMF, ¶22).

Murrell received annual performance reviews, prepared each year by Wangerin. (DSUMF, ¶59). Wangerin examined whether claims adjusters met a number of performance measures when he prepared performance evaluations. (DSUMF, ¶60). Wangerin's performance evaluations determined Murrell's compensation. (DSUMF, ¶61). In 2010, Murrell received a "fair" performance rating, which was the second-lowest rating on a five-point scale. (DSUMF, ¶62). Murrell was terminated prior to receiving a performance rating in 2011. (DSUMF, ¶63).

Allstate used customer service surveys (called Estimate Requirement Index ("ERI")), which counted for 50% of Murrell's 2011 performance review, to evaluate adjusters' customer service in preparing performance evaluations. (DSUMF, ¶¶64-65). As part of the estimate process in Audatex,[1] adjusters are required to select the Inspection Type from a drop-down menu

---

[1] Audatex is a database owned by Solara (formerly ADP) which was used by Allstate adjusters to prepare estimates. (DSUMF, ¶32). Audatex provides prices for parts, establishes times for certain replacement procedures and refinish times, and allows the adjuster to set estimated repair times based upon his or her professional opinion. (DSUMF, ¶33). At the beginning of each appointment, Murrell signed in to Audatex to prepare the estimate. (DSUMF, ¶34).

identifying the location where the insured's automobile was examined by the claim adjuster. (DSUMF, ¶68). Selection by the adjuster of the drive-in or field inspection type created the possibility that an ERI survey would be generated for the insured. (DSUMF, ¶69). An adjuster could also select the inspection type of "Unknown" that would not result in the possibility of generating an ERI survey. (DSUMF, ¶71). Murrell testified that he began using the inspection type "Unknown" after being instructed to do so at the 2011 Kansas City MCO Kickoff Meeting. (DSUMF, ¶73). Murrell testified that adjusters were instructed that under certain circumstances, with their FPL's approval, adjusters could change the inspection type to "Unknown". (DSUMF, ¶74).

### B. Murrell's Termination

In early September 2011, Frontline Process Expert ("FPE") Wendy Hargrove ran an Audatex insight report for Jenkins that filtered the results by inspection type: "Unknown." (DSUMF, ¶76). As a result of running that report, Allstate discovered approximately 400 estimates in which the inspection type was marked as "Unknown." (DSUMF, ¶77). Of those 400 estimates where "Unknown" was marked, 330 were found in Unit-V. (DSUMF, ¶78). After this was discovered, Jenkins contacted Wangerin regarding the high number of "Unknowns." (DSUMF, ¶79). On September 15, 2011, Wangerin sent Unit-V adjusters an email containing a screen shot of the Audatex drop-down box advising them not to use the "Unknown" category for inspection type. (DSUMF, ¶81). The audit indicated that Murrell marked the inspection type as "Unknown" on twenty-one claims. (DSUMF, ¶87).[2]

---

[2] In order to reach only the worst offenders, Allstate claims that it limited its investigation to the claims adjusters who used "Unknown" more than 20 times since January 2011. (DSUMF, ¶88). The four claims adjusters from Unit-V who were excluded from Allstate's investigation had used "Unknown" 3, 4, 9 and 16 times, respectively. (DSUMF, ¶90).

Allstate interviewed Wangerin, Murrell, and five other adjusters from Unit-V. (DSUMF, ¶89). During a November 8, 2011 videoconference, Murrell admitted that he had changed the method of inspection to "Unknown," which he knew would affect the survey (if any) that was given to the consumer. (DSUMF, ¶¶91-92). Murrell admitted that by changing the method of inspection to "Unknown," he was creating an incorrect record in order to prevent the customer from receiving a survey. (DSUMF, ¶¶93-94). Chapter 2 of Allstate's HR Policy Guide prohibits the falsification or alteration of company documents or "provid[ing] false information in those documents." (DSUMF, ¶98). Dishonesty and falsification of Allstate documents is conduct which subjects an employee to immediate termination. (DSUMF, ¶99). Based upon the evidence uncovered during Allstate's investigation, Allstate concluded that Murrell had falsified claim records by indicating the Inspection Type was "Unknown" on claims even though he performed the inspections in the drive-in or field. (DSUMF, ¶101). Allstate claims that Murrell was terminated on January 4, 2013 for dishonesty and falsification of company documents. (Id.).

Murrell alleges that he was wrongfully discharged for complaining about Allstate undervaluing estimates of drive-in customers in violation of public policy. (DSUMF, ¶¶118, 120). Murrell also claims that that he was discriminated against because of his age (DSUMF, ¶130). Murrell was fifty-nine (59) years old at the time of his termination from Allstate. (DSUMF, ¶102). Allstate claims that it also terminated five other adjusters (ages 49, 53, 57, 57 and 58) from the Unit-V on January 4, 2012 for dishonesty and falsification of company documents. (DSUMF, ¶103).

Following the terminations on January 4, 2012, Jenkins told the remaining adjusters in the Unit-V why the five other adjusters were terminated. (DSUMF, ¶106). Five claim trainees

(ages 31, 40, 41, 44 and 46) were hired to the Unit-V between January 2012 and July 2012. (DSUMF, ¶107).

C.  Overtime

Murrell alleges that he was not compensated for his overtime hours.  Including time spent driving to estimates and evening phone calls, Murrell contends that he averaged 10 hours of work per day, or 50 hours per week.  (PSUMF, ¶19).

Murrell was a non-exempt hourly employee.  (DSUMF, ¶40).  Allstate contends that Murrell worked a self-directed 40-hour workweek, meaning that he was responsible for tracking his own time and reporting hours worked in excess of forty hours in a workweek.  (DSUMF, ¶41).  Murrell claims that the WFMS or Gantt chart routinely underestimated driving times, as well as inspection times.  (PSUMF, ¶9).  Murrell stated that adjustors regularly ran over their allotted time for tasks in the Gantt system because the time for processing a total loss took 2.5 hours, as opposed to the 1 hour that the Gantt schedule allowed.  (PSUMF, ¶¶10, 11).  Murrell left his home to drive to his first estimate at approximately 7:15 a.m. to 7:30 a.m. each day. (PSUMF, ¶6).  Murrell typically finished his estimates at approximately 5:30 p.m. to 6:00 p.m. (PSUMF, ¶13).  At the end of each day, Murrell received his assigned tasks for the following day.  (PSUMF, ¶14).  Murrell claims that assignments were supposed to be available at 3:00 p.m. but often were not available until much later if the system was not working correctly.  (PSUMF, ¶16).  On Sunday, he received his assignments for the following Monday.  (DSUMF, ¶46; PSUMF, ¶15).  After receiving his assignments for the next day, Murrell had to call each customer to confirm the appointment and coordinate the details.  (PSUMF, ¶17; DSUMF, ¶17). Although Murrell marked a particular time for starting an inspection and a particular time for

completing it, Allstate asserts that this that did not necessarily mean that he worked solely on that claim during that time.  (DSUMF, ¶19).

Murrell states that he regularly reported working in excess of 40 hours to his supervisor, Wangerin.  (PSUMF, ¶20).  Murrell asserts that every adjuster in the unit complained to Wangerin about the extra hours required to complete their work.  (PSUMF, ¶22).  Murrell claims that Wangerin told Murrell that he was not authorized to pay for overtime and that extra hours were just "part of the job."  (PSUMF, ¶21).  Wangerin had to approve all overtime work in order for the adjusters to be paid.  (PSUMF, ¶25).  Murrell maintains that Wangerin was only authorized to approve overtime in certain preapproved circumstances, such as when a catastrophic hail storm caused widespread damage.  (PSUMF, ¶26).

D.  Litigation

On April 27, 2012 Murrell filed a charged of discrimination, alleging age discrimination, with the Missouri Commission on Human Rights ("MCHR") against Allstate.  (DSUMF, ¶113). On July 2, 2012, Murrell requested a Right to Sue letter from the MCHR.  (DSUMF, ¶114). Murrell then filed the instant lawsuit on August 22, 2012 against Allstate in the Eleventh Judicial Circuit, St. Charles County, Missouri.  (DSUMF, ¶116).  On September 20, 2012, Allstate removed this action to the United States District Court for the Eastern District of Missouri.  (ECF No. 1).  On February 19, 2013, Murrell filed an Amended Complaint, alleging claims for unpaid overtime pursuant to the Missouri Minimum Wage Law ("MMWL") (Count I) and the Fair Labor Standards Act ("FLSA") (Count III), a claim for age discrimination under the Missouri Human Rights Act ("MHRA") (Count II), a claim for wrongful termination in violation of public policy (Count IV), and a claim for defamation (Count V).  (ECF No. 29).

# MOTION FOR SUMMARY JUDGMENT

## I.    Motions for Summary Judgment Standard

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986); Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011).  The substantive law determines which facts are critical and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Only disputes over facts that might affect the outcome will properly preclude summary judgment.  Id.  Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id.  A moving party always bears the burden of informing the Court of the basis of its motion.  Celotex Corp., 477 U.S. at 323.  Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute."  Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 248. The nonmoving party may not rest upon mere allegations or denials of his pleading.  Anderson, 477 U.S. at 258.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. Celotex Corp., 477 U.S. at 331.  The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

facts are jury functions, not those of a judge.'" Torgerson, 643 F.3d at 1042 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).

## II.     Defendant's Motion for Summary Judgment

### A.  Age Discrimination under the MHRA

#### 1.  Prima Facie Case of Age Discrimination

Murrell alleges that Allstate discriminated against him on the basis of his age in violation of the MHRA, Mo.Rev.Stat. §213.010, *et seq*.  The approach to a state-law discrimination claim under the MHRA is the same as that for a federal claim under the Age Discrimination in Employment Act (ADEA).  Riley v. Lance, Inc., 518 F.3d 996, 1000 (8th Cir. 2008)(citing Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P., 444 F.3d 961, 964 (8th Cir. 2006). The Court, however, also recognizes that "Missouri's discrimination safeguards under the MHRA, however, are not identical to the federal standards and can offer greater discrimination protection."  Daugherty v. City of Maryland Heights, 231 S.W.3d 814, 818-19 (Mo. 2007)(applying the "contributing factor" analysis to an age discrimination claim under the MHRA).  Under the MHRA, a plaintiff can survive summary judgment if there is a genuine issue of material fact as to whether age was a "contributing factor" in the defendant's decision to terminate the plaintiff.  Calvin v. City of Laurie, Mo., 2:11-CV-04124, 2012 WL 5866554, at *8 (W.D. Mo. Nov. 19, 2012)(quoting Daugherty v. City of Maryland Heights, 231 S.W.3d 814, 820 (Mo. 2007)); Clark v. Matthews Int'l Corp., 639 F.3d 391, 398 (8th Cir. 2011). "Under the contributing factor standard, the test is 'whether an illegal factor played a role in the decision to discharge the employee.'"  Calvin, 2012 WL 5866554, at *8 (quoting Fleshner v. Pepose Vision Inst., 304 S.W.3d 81, 94 (Mo. 2010)).

The record does not contain any direct proof that Murrell was terminated based upon his age. Where, as in this case, any evidence of age discrimination is circumstantial, the Court applies the McDonnell Douglas burden-shifting analysis. Riley v. Lance, Inc., 518 F.3d 996, 1000 (8th Cir. 2008)(citing Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P., 444 F.3d 961, 964 (8th Cir.2006)); Calvin, 2012 WL 5866554, at *8 (applying the burden shifting analysis to the plaintiff's MHRA age discrimination claim). "'If the plaintiff shows a *prima facie* case of employment discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its conduct.'" Grissom v. First Nat. Ins. Agency, 364 S.W.3d 728, 739 (Mo. Ct. App. 2012)(quoting Murray v. Southwest Missouri Drug Task Force, 335 S.W.3d 566, 569 n. 7 (Mo. Ct. App. 2011)). "If that happens, the burden shifts back to the plaintiff to show that the proffered justification is merely a pretext for discrimination." Id.; see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800–01 (1973); Midstate Oil Co., Inc. v. Missouri Comm'n on Human Rights, 679 S.W.2d 842, 845 (Mo. banc 1984).

In order to make a submissible age discrimination claim, a plaintiff must present sufficient competent evidence from which a reasonable trier of fact could find: (1) that the plaintiff is in a protected age classification; (2) that the defendant terminated the plaintiff; (3) that the defendant's consideration of plaintiff's age contributed to its decision to terminate the plaintiff; and (4) that plaintiff was thereby damaged. Hurst v. Kansas City, Missouri Sch. Dist., WD76534, 2014 WL 1677822 (Mo. Ct. App. Apr. 29, 2014)(citing § 213.055.1; Thomas v. McKeever's Enters. Inc., 388 S.W.3d 206, 214 (Mo.App.W.D.2012)).

Allstate asserts that Murrell cannot make out a prima facie showing of age discrimination because there is no evidence to suggest that he was meeting Allstate's legitimate expectations when he was terminated. (ECF No. 55 at 8). Allstate notes that, for several months prior to

Murrell's termination, he was regularly misrepresenting inspections as "Unknown" when they should have been categorized as "Drive-In" or "Field". (Id.) Further, Allstate emphasizes that Murrell admitted entering false information and that such actions were prohibited by Allstate's written policies. (Id.) Allstate notes that, although Murrell now claims that he was instructed to change the inspection codes to "Unknown" at a sales meeting and by his supervisor Wangerin, Murrell admitted during his interview with the company that he changed the method of inspection to "Unknown" at his discretion to avoid a negative customer survey. (ECF No. 69 at 4-5).

Even if Murrell had been meeting Allstate's legitimate expectations, Allstate states that he cannot demonstrate that he was treated less favorably than similarly situated younger employees. (ECF No. 55 at 8). Murrell only identified one person, Jerry DeGrendele, who Murrell claimed was similarly situated but was not terminated. (ECF No. 55 at 8-9). Jerry DeGrendele was 47 when Murrell was terminated. (ECF No. 55 at 8). Further, Jerry DeGrendele had just four "Unknowns" since January 2011, compared to Murrell's 21 "Unknowns." Therefore, Allstate claims that Jerry DeGrendele was not a comparable employee and it is entitled to summary judgment. Allstate further claims that the people that purportedly replaced Murrell and the other terminated adjusters are not proper comparators because they were merely "claim trainees" not "adjusters". (ECF No. 69 at 3). Allstate also notes that four out of five of the claim trainees were 40 years of age or older, which Allstate asserts "surely destroys any presumption of age discrimination." (ECF No. 69 at 3-4).

In response, Murrell argues that he has established his prima facie case under the McDonnell-Douglas framework. (ECF No. 59 at 11). Murrell was 59 years old at the time of his termination. Murrell asserts that he was treated less favorably than younger employees

because he and the other terminated adjusters (aged 49, 53, 57, 57, and 58) were replaced by "adjusters" aged 31, 40, 41, 44, and 46. (ECF No. 59 at 11; DSUMF, ¶¶103, 107).

Murrell further claims that he was performing all of the tasks as assigned. (ECF No. 59 at 11). Murrell asserts that he was told by a high ranking Allstate employee at the January 2011 kickoff meeting and by his supervisor, Wangerin, to use "Unknown" when a customer was angry at Allstate prior to the estimate. (Id.).[3] Murrell claims that he used "Unknown" in the approved circumstances and with the prior approval of supervisor Wangerin. (Id.).

Construing all facts in favor of Murrell, the Court finds that Murrell has presented evidence to support a prima facie case of age discrimination against Allstate. First, the Court finds evidence that Murrell was meeting Allstate's legitimate expectations. Allstate's only stated reason that Murrell was not meeting its legitimate expectations was that Murrell was using the "Unknown" field in contravention of Allstate's policy. Murrell, however, testified that he and other adjusters were instructed to use the "Unknown" field when they knew that an Allstate customer was going to be angry and poorly review the adjuster. The position is supported by the fact that Wangerin and several other adjusters were terminated for the same conduct. The fact that they were all using this "Unknown" field indicates that, as Murrell states, they were instructed to do so. The Court does not believe that Murrell's testimony during his interview with Allstate prior to his termination was entirely inconsistent with this position. Murrell apparently told Allstate that he used the "Unknown" at his discretion and in order to avoid an adverse customer survey. From the record, there is evidence to support a finding that his manager, Wangerin, gave his approval for this use of "Unknown." As such, Murrell may have

---

[3] Allstate admits that, on September 15, 2011, Wangerin sent Unit-V adjusters an email containing a screen shot of the Audatex drop-down box, advising them not to use the "Unknown" category for inspection type. (DSUMF, ¶81).

understood that he had Wangerin's prior approval to use "Unknown" without consulting him every time. Thus, the Court finds that Murrell has satisfied this element.

Further, the Court finds that Murrell has provided evidence to support a finding that his age was a contributing factor to his termination because he was replaced by younger workers. Murrell was 59 when he was terminated. The other terminated adjusters (aged 49, 53, 57, 57, and 58) were replaced by claim trainees, aged 31, 40, 41, 44, and 46. Allstate maintains that the claim trainees are not proper comparators because they were claim trainees and not adjusters. The Court does not believe that this is a proper distinction. Allstate does not assert that the claim trainees were not hired to become adjusters. The nature of age discrimination is that a company replaces older, experienced workers with younger, less experienced workers. Inherent in such discrimination is that the younger workers would not start out in the exact position of these older, more experienced workers and that the younger workers would need to be trained. Thus, the Court holds that the claims trainees are adequate comparators.

Further, the Court holds that the age differential between the terminated adjusters and the claims trainees is sufficient to maintain an age discrimination claim. The fact that four of the five claim trainees were 40 years of age or older does not automatically preclude a finding of age discrimination. Under O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996), a worker in the protected age class may maintain an age discrimination claim if he was terminated because of his age. As noted by the Supreme Court, "[t]his language does not ban discrimination against employees because they are aged 40 or older; it bans discrimination against employees because of their age, but limits the protected class to those who are 40 or older." Id. For an age discrimination claim, the plaintiff must be a member of the protected class, i.e., over 40 year old. However, "[b]ecause the ADEA prohibits discrimination on the basis of age and not class

membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." Id., 517 U.S. at 313. The comparator worker does not need to be outside of that protected classification. Based upon the foregoing, the Court holds that Murrell has alleged facts that would support a prima facie case of age discrimination.

### 2. Legitimate Non-Discriminatory Reason for Terminating Murrell

Further, Allstate asserts that it has articulated a legitimate, non-discriminatory reason for terminating Murrell and he has not demonstrated any pretext on behalf of Allstate for the termination. (ECF No. 55 at 9). Allstate claimed that it terminated Murrell because he falsified claim records and, as a result, was dishonest and fraudulent with his employer. (Id.) Allstate asserts that this is a legitimate, nondiscriminatory reason. Allstate claims that it does not matter that Murrell now claims that he was instructed to change the field to "Unknown" because it "does not change the fact that his termination really was for falsification of documents in violation of Allstate's policies, not a pretext for discrimination." (ECF No. 55 at 10). Allstate asserts that Murrell has not provided any evidence in support of its assertion that its reason for terminating Murrell was merely pretext. (ECF No. 55 at 10-11). Allstate maintains that the fact that all six of the adjusters who were terminated for misusing the "Unknown" were all over 40 years old cannot be evidence of pretext because four of the five adjusters who were not discharged for falsifying claim records were also over 40 years old. (Id.).

In turn, Murrell asserts that he performed all of his tasks as he was assigned. (ECF No. 59 at 11). Murrell maintains that his use of "Unknown" was in line with the instructions he received by Allstate employee Hargrove at the 2011 January annual kickoff meeting. Hargrove said to use "Unknown" with their supervisor's permission, and Wangerin, Murrell's supervisor, told his

adjusters to use "Unknown." (Id.) Murrell claims that he used "Unknown" in instances that were approved of by his supervisor, Wangerin. (Id.) Murrell also notes that he was not subjected to any disciplinary action prior to his termination. (Id.)

This argument dovetails with the Court's discussion on whether Murrell was qualified for his position and established a prima facie case of discrimination. As discussed above, the Court finds that an issue of fact exists regarding whether Murrell was meeting Allstate's legitimate expectations, which precludes summary judgment in favor of Allstate. Murrell has presented evidence that he was using the "Unknown" category as directed by his Allstate supervisor and was instructed at an Allstate kick-off meeting. Construing these facts in favor of Murrell, the Court finds that Murrell could have been meeting his employer's legitimate expectations, even though he was using the "Unknown" category. See, e.g., ECF No. 60 at 16 (Wangerin testified that it was Jenkins that told him under what circumstances his adjusters could use "Unknown" in the first place). Further, the Court reiterates that Murrell's testimony prior to his termination that he used the "Unknown" category at his discretion is not necessarily incongruous with his current position. From the evidence presented, a fact finder could conclude that Wangerin instructed his adjusters to use the "Unknown" any time a customer was dissatisfied and that prior approval was not required each time the "Unknown" category was used. This position is also supported by the fact that several Unit-V adjusters frequently used the "Unknown" category. Accordingly, the Court finds that an issue of fact exists as to whether Murrell was meeting his employer's legitimate expectations and the Court denies Allstate's Motion for Summary Judgment on Allstate's MHRA claim for age discrimination in Count II.

**B. Wrongful Discharge**

Under Missouri law, an employee is considered to be "at-will," which means that he can be fired for any reason or for no reason, without liability for wrongful discharge. Kmak v. Am. Century Companies, Inc., 13-1530, 2014 WL 2524587, at *4 (8th Cir. June 5, 2014)(citing Sivigliano v. Harrah's N. Kan. City Corp., 188 S.W.3d 46, 48 (Mo. Ct. App. 2006)). An exception to this "at-will" employment rule recognized by Missouri court is the "public policy exception." Noel v. AT & T Corp., 936 F. Supp. 2d 1084, 1088 (E.D. Mo. 2013)(citing Margiotta v. Christian Hosp. Northeast Northwest, 315 S.W.3d 342, 346 (Mo. 2010)). "'The public policy exception to the at-will employment rule, often called the wrongful discharge doctrine, is very narrowly drawn. An at-will employee may not be terminated for refusing to perform an illegal act or reporting wrongdoing or violations of law to superiors or third parties.'" Noel, 936 F. Supp. 2d at1088 (quoting Margiotta, 315 S.W.3d at 346). "[A] wrongful discharge action must be based on a constitutional provision, a statute, a regulation based on a statute, or a rule promulgated by a governmental body." Farrow v. Saint Francis Med. Ctr., 407 S.W.3d 579, 595 (Mo. 2013)(citing Margiotta, 315 S.W.3d at 346); see also Hedrick v. Jay Wolfe Imports I, LLC, 404 S.W.3d 454, 457-58 (Mo. Ct. App. 2013)(quoting Delaney v. Signature Health Care Found., 376 S.W.3d 55, 56 (Mo. Ct. App. 2012 )) ("'That exception establishes a cause of action for at-will employees who have been discharged in violation of a clear mandate or public policy reflected in the letter and purpose of a constitutional, statutory, or regulatory provision or scheme, in the judicial decisions of state and federal courts, in the constant practice of government officials, and, in certain instances, in professional codes of ethics.'"). "'Specifically, an employee has a cause of action when he or she has been discharged for: (1) refusing to perform an illegal act or an act contrary to a strong mandate of public policy; (2) reporting the

employer or fellow employees to superiors or third parties for their violations of law or public policy; (3) acting in a manner public policy would encourage; or (4) filing a claim for workers' compensation.'" Hedrick v. Jay Wolfe Imports I, LLC, 404 S.W.3d 454, 458 (Mo. Ct. App. 2013)(quoting Delaney, 376 S.W. 3d at 57); see also Drummond v. Land Learning Found., 358 S.W.3d 167, 171 (Mo. Ct. App. 2011)("Internal reporting to superiors of illegal actions by other employees can constitute protected activity."); Fleshner, 304 S.W.3d at 97, n.13 ("[A]n employee who is fired for informing his superiors of wrongdoing by other employees is entitled to bring suit."). "Absent such explicit authority, an employee's wrongful discharge claim fails as a matter of law." Farrow, 407 S.W.3d at 595 (citing Margiotta, 315 S.W. 3d at 346).

Here, Murrell attempts to allege a wrongful discharge claim in violation of public policy based upon the exception for "reporting the employer or fellow employees to superiors or third parties for their violations of law or public policy." Murrell claims that his Allstate supervisors instructed him to "undervalue the estimates of drive-in customers." (First Amended Complaint, ¶59). Murrell claims that Allstate's practices are contrary to public policy as reflected in Mo. Rev. Stat. §§375.445, 375.144, 570.160 and C.S.R. 100-1.010-300. (First Amended Complaint, ¶¶59-61). Mo.Rev.Stat. §375.445 prohibits insurance companies from carrying out their contracts in bad faith. Mo.Rev.Stat. §375.144 makes it "unlawful for any person, in connection with the offer, sale, solicitation or negotiation of insurance, directly or indirectly, to: [e]mploy any deception, device, scheme, or artifice to defraud." Mo.Rev.Stat. §570.140.1 prohibits "deceptive business practice[s]." Criminal statute Mo.Rev.Stat. §570.160 prohibits "false advertising." Murrell also claims that Allstate's conduct violated the Code of State Regulations 100-1.010 through 100-1.300 or all ten regulations contained in Missouri's "Improper or Unfair Claims Settlement Practices."

Allstate claims that it is entitled to summary judgment on Murrell's wrongful discharge claim for several reasons. First, Allstate maintains that Murrell never complained of any "serious misconduct" or any "violation of the law" on Allstate's part. (ECF No. 55 at 12). In fact, Allstate notes that the estimate provision about which Murrell complains is the part of the express contract between Allstate and its insured. (ECF No. 55 at 13-14).

Second, Allstate asserts that, even if Murrell did complain about serious misconduct in violation of law or public policy, Murrell has not presented evidence that he reported the conduct to the proper authorities. (ECF No. 55 at 14). Instead, Allstate alleges that Murrell reported the improper conduct to other wrongdoers. (ECF No. 55 at 14 (citing Drummond, 358 S.W.3d at 171 ("a report of wrongdoing to the wrongdoer is insufficient to invoke the whistleblowing public policy exception"). Murrell alleges that he reported the misconduct to Wangerin and DeGrendele, who were also writing estimates very inexpensively.

Finally, Allstate asserts that Murrell has not demonstrated a causal connection between his complaint and his termination, which is necessary to support a claim for wrongful discharge. (ECF No. 55 at 14 (citing Fleshner, 304 S.W.3d at 94). Murrell cannot recall when he complained to Wangerin and DeGrendele about "writing estimates very inexpensively." (DSUMF, ¶123). Additionally, Allstate points out that Murrell has not demonstrated a causal connection because Wangerin and DeGrendele (the people to whom Murrell complained) and his termination; Wangerin and DeGrendele were not the people who made the decision to terminate Murrell. (ECF No. 55 at 14 (citing May v. Pratt Indus. (U.S.A.), Inc., 1:06CV129 HEA, 2008 WL 1777409, at *5 (E.D. Mo. Apr. 16, 2008)(granting summary judgment to the employer on a wrongful discharge claim where there was "absolutely no evidence that [the decisionmaker] knew of" the alleged report of public policy violation).

In response, Murrell asserts that Allstate's estimate process violated Missouri law and regulations because Allstate purposefully undervalued its estimates in order to discourage customers from getting their repairs. (ECF No. 59 at 17). Murrell complained that, for its customers' repairs, Allstate used the database from carparts.com, which included parts from out-of-state but did not include the shipping price in the estimate. (Id.). Murrell claims that this left customers discouraged and they did not request a supplement, which allowed Allstate to come out of the claim without having to pay the full price of the repair. (Id.).

Murrell claims that Allstate's process violated all of the cited provisions, Mo. Rev. Stat. §§375.445, 375.144, 570.140, 570.160 and C.S.R. 100-1.010-300. Murrell claims that the undervalue scheme violated section 375.445 because Allstate did not perform its contractual duties in good faith in that Allstate provided a repair check that did not include the shipping cost. (ECF No. 59 at 18). Murrell claims that Allstate violated section 375.144 because it made a misrepresentation of material fact that the estimate would cover the full cost of repair. (Id.) Murrell states that Allstate violated criminal law in section 570.160 because it falsely advertised the extent of its services to its customers and violated section 570.140 because Allstate utilized a deceptive business practice in its agreement with customers by claiming that it would cover the entire cost of the repair, but undervaluing the initial estimate. Finally, Murrell claims that Allstate violated Missouri insurance regulations, specifically 20 CSR §100-1.050. (ECF No. 59 at 18-19). Murrell asserts that the undervaluing "scheme" violated subsection (2)(D)(1), which requires the estimate to be in an amount for which it may be reasonably expected the damages can be satisfactorily repaired. Murrell maintains that Allstate's policy violated this because the initial estimates would not cover the repair cost because they excluded shipping. Also, Murrell states that Allstate's conduct violated subsections (F) and (G) because Allstate failed to return

the vehicle to its pre-loss condition (or pay the cash equivalent) without further loss to the customer. Instead, Murrell states that Allstate's policy required the customer to "expend his or her time and effort to hound Allstate for the supplement, which Allstate always knew would be necessary." (Id.).

Murrell asserts that he repeatedly complained about Allstate's policies to Wangerin and DeGrendele. (ECF No. 59 at 20). Murrell states that Allstate's conduct invoked public policy issues and that he reported these violations to his superiors. Murrell claims that there are unresolved issues of material fact as to whether Allstate's stated reasons for termination were pretextual, or a result of retaliation.

The Court grants summary judgment in favor of Allstate on Count IV for several reasons. First, the Court finds that Murrell never complained of Allstate's "serious misconduct" or any "violation of the law" and, therefore, he cannot state a claim for wrongful discharge in violation of public policy. The Court does not believe that the evidence supports a finding that Allstate's payment policy constituted a misrepresentation of material fact under section 375.144, that Allstate violated its duty to perform its contractual duties in good faith under section 375.445, or that Allstate did not comply with its estimate-writing obligations under 20 CSR §100-1.050. Allstate was always required to pay the cost of the repair at whatever rate was negotiated with the body shop that completed the repair. Likewise, there is no evidence that Allstate violated the criminal law in sections 570.140 and 570.160 through its alleged undervaluation scheme. There is no evidence, other than Murrell's pure conjecture, that Allstate's customers were in any way harmed by its pricing policy. Thus, the Court finds no statutory basis for Murrell's public policy claim and the Court grants summary judgment in favor of Allstate on this basis.

In addition, the Court finds that Murrell cannot allege a claim for wrongful discharge under the public policy exception where he only reported the alleged unlawful activity to Wangerin and DeGrendele. The evidence before the Court is that Wangerin, Murrell's supervisor, and DeGrendele, another adjuster, were pricing the repairs according to Allstate's allegedly illegal policy. (DSUMF, ¶123). Missouri courts have held that "[r]eporting to the wrongdoer does not expose the wrongdoer or his wrongdoing and, thus, does not further the accepted clear mandate of public policy." Drummond, 358 S.W.3d at 171 (citing Faust v. Ryder Commercial Leasing & Servs., 954 S.W.2d 383, 391 (Mo. Ct. App. 1997)). Thus, even if Allstate's alleged scheme was somehow unlawful, the public policy exception offers Murrell no protection because Murrell only reported the wrongdoing to other wrongdoers, Wangerin and DeGrendele. Id.

Finally, the Court agrees that Murrell has not demonstrated a causal connection between his reporting and his termination. Murrell states that he reported the allegedly unlawful Allstate policy to his supervisor, Wangerin, and to DeGrendele, another adjuster. Murrell has not presented any evidence that the person who terminated Murrell had any knowledge that Murrell reported regarding "writing estimates very inexpensively." Thus, Murrell has not established a causal connection between his reporting of allegedly illegal acts and his termination. See May, 2008 WL 1777409, at *5.

Based upon the foregoing, the Court grants Allstate's Motion for Summary Judgment as to Count IV for wrongful termination in violation of public policy.

## C. FLSA & MMWL[4]

In Counts I and III, Murrell alleges that he was not paid for work he performed in excess of 40 hours per week. To establish an FLSA or MMWL claim for unpaid overtime, the employee

---

[4] This is also the subject of Plaintiff's Motion for Summary Judgment.

must (1) prove "that he has in fact performed work for which he was improperly compensated" and (2) "produce[ ] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680, 687 (1946), cited in <u>Hertz v. Woodbury Cnty., Iowa</u>, 566 F.3d 775, 783 (8th Cir. 2009). "In an action for overtime wages brought under the FLSA, 'the burden is upon the plaintiff to establish by a preponderance of the evidence the number of hours worked and the amount of damages due.'" <u>Gomez v. Tyson Foods, Inc.</u>, 976 F. Supp. 2d 1169, 1180 (D. Neb. 2013)(quoting <u>Johnson v. Dierks Lumber & Coal Co.</u>, 130 F.2d 115, 118 (8th Cir. 1942)).

 In its Motion for Summary Judgment, Allstate argues that Murrell has not produced competent evidence in support of his overtime claims. (ECF No. 55 at 15). Allstate argues that Murrell has not met its evidentiary burden set out in <u>Mt. Clemens</u> by presenting sufficient evidence of the amount or extent of hours worked in excess of forty hours per week. (<u>Id.</u>) Allstate points the Court to <u>Carmody v. Kansas City Bd. of Police Comm'rs</u>, 713 F.3d 401 (8th Cir. 2013) where the Eighth Circuit affirmed the district court's grant of summary judgment in favor of the city because the police officers "did not provide any evidence of actual damages because the testimony contained no reference to overtime hours that violated the FLSA." <u>Id.</u>, 713 F.3d at 407. Allstate claims that, like <u>Carmody</u>, Murrell's "vague assertions of estimated numbers will not suffice." (ECF No. 55 at 16). Allstate claims that Murrell's allegations of uncompensated overtime are not supported by Allstate's computer systems because even if Murrell entered the start and stop time for an inspection into the computer systems, that did not mean that he worked on that inspection for the entire time. (ECF No. 55 at 17)(citing Murrell's testimony). Allstate contends that there is no evidence that the Gantt chart reflects the hours Murrell actually worked. (ECF No. 69 at 10) Allstate likewise asserts that Murrell's testimony

that he worked on Sundays and after 5:00 pm does not establish that Murrell worked in excess of 40 hours per week because he was encouraged to take time off at other times to compensate for working in the evening and on Sundays.  (ECF No. 55 at 17).  Allstate notes that Murrell testified he was compensated for overtime when he worked in Springfield or Kansas City.  (ECF No. 55 at 17-18).  Finally, Allstate argues that Murrell's affidavit that purports to assert that he worked 10 hours of overtime every week must be stricken because it conflicts with his prior testimony that he would be able to discern his amount of unpaid overtime from Allstate's computer records.  (ECF No. 60 at 10-11).  Instead, Allstate notes that Murrell does not rely on Allstate's computer records (as he previously testified he would) and provides no record evidence of unpaid overtime by Murrell.  (Id.)

Murrell states that Allstate has not produced any evidence to refute the evidence of unpaid overtime for Murrell's extended working hours.  (ECF No. 59 at 8).  Murrell states that he has provided the testimony of four of the former Allstate employees who were deposed and each testified that the adjuster job required working hours in excess of forty hours per week.  (ECF No. 59 at 8).  Murrell testified that he had to work nights to prepare for appointments on the following business day.  (Id.)  Murrell also testified that the Gantt chart underestimated the time required to perform each assignment, which resulted in the adjuster having to work longer hours to complete the work.  (Id.)  Murrell also provided testimony that overtime compensation required the approval of the adjuster's supervisor.  (ECF No. 59 at 9).  Murrell produced evidence that Wangerin, Murrell's supervisor, only authorized overtime in preapproved circumstances, such as a catastrophic hail storm and never during the run-of-the-mill weekly overtime for completing the assigned tasks.  (Id.)  Finally, Murrell provided an affidavit stating that he worked 10 hours of overtime every week but was not compensated.  (ECF No. 60-1).

Murrell provides evidence that Wangerin testified that "Allstate made no attempt to record and document the amount of hours of any of its adjusters, including Murrell, actually worked, despite the fact that Murrell regularly told Wangerin about them at staff meetings." (ECF No. 59 at 9). Murrell claims that he has met his burden under the Mt. Clemens standard. (ECF No. 59 at 9). Murrell also alludes that he has satisfied the standard in Donovan v. Tony & Susan Alamo Found., which applies when an employer does not maintain accurate records and provides:

> The solution to the problem presented "where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes" is not to "penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying the compensation as contemplated by the Fair Labor Standards Act. In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate."

Donovan v. Tony & Susan Alamo Found., 722 F.2d 397, 404 (8th Cir. 1983)(citations omitted), aff'd sub nom. Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 105 S. Ct. 1953, 85 L. Ed. 2d 278 (1985). Murrell claims that "Allstate now bears the burden to produce some evidence refuting Murrell's claimed hours" but it cannot because "by its own admission it maintained no such records." (ECF No. 59 at 9). Murrell claims that Allstate's motion for summary judgment must be denied because Allstate has failed to maintain Murrell's hourly records.

The Court holds that an issue of fact exists that precludes summary judgment on Murrell's overtime claims. There is evidence before the Court that Murrell and other adjusters

repeatedly complained to their supervisor, Wangerin, that they consistently had to work overtime in order to complete their required tasks. (PSUMF, ¶¶20-23) Murrell testified that he repeatedly complained to his supervisor about his schedule that forced him and the others work off-the-clock in order to complete all of their daily assignments. In addition, there is evidence that adjusters frequently worked in excess of 40 hours per week (PSUMF, ¶22), but that Wangerin was only authorized to approve overtime in limited circumstances (PSUMF, ¶26). Thus, construing the evidence in favor of the nonmoving party, the Court holds that a reasonable fact finder could discern that Murrell worked unpaid overtime with Allstate's knowledge. See Hertz v. Woodbury County, Iowa, 566 F.3d 775, 781 (8th Cir.2009)(an employer is liable for its employees' unpaid overtime work if the employer "knew or should have known that they were working overtime"); 29 C.F.R. § 785.13 ("[I]t is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed," management "cannot sit back and accept the benefits without compensating for them," and "[t]he mere promulgation of a rule against such work is not enough" because "[m]anagement has the power to enforce the rule and must make every effort to do so."). The Court believes that a fact finder could believe that adjusters were regularly assigned work that could not be completed within the adjuster's "self-regulated" 40 hour workweek and, as a result, the adjusters were not compensated for all of their time. See Brennan v. Qwest Commc'ns Int'l, Inc., 727 F. Supp. 2d 751, 762 (D. Minn. 2010)(quoting Skelton v. Am. Intercontinental Univ. Online, 382 F.Supp.2d 1068, 1071–72 (N.D. Ill. 2005)("if an employer commands, entices, or encourages its employees not to record all of their overtime, it cannot then 'hide behind a policy of having employees keep their own time'").

Further, the Court holds that Murrell's affidavit is sufficient to create an issue of material fact that precludes entry of summary judgment. <u>See</u> <u>England v. Advance Stores Co. Inc.</u>, 263 F.R.D. 423, 450 (W.D. Ky. 2009). The district court in England addressed a similar situation:

> While a baldly conclusory and self-serving affidavit devoid of any substantial detail may not be relied on, a plaintiff who alleges that he or she was not paid, but was forced to work off-the-clock, will avoid [judgment] as a matter of law so long as the evidence put forward by the employee," which can consist solely of the plaintiff's own testimony, "is a sufficient basis on which a reasonable juror could infer that the employee had performed work for his or her employer for which no compensation had been paid and the employer had reason to know of such circumstances."

<u>Id.</u>; <u>Brennan v. Qwest Commc'ns Int'l, Inc.</u>, 727 F. Supp. 2d 751, 763 (D. Minn. 2010). The Court finds that Murrell has set forth "good-faith estimates of the number of hours for which [he was] not paid" and provides additional evidence in support his unpaid overtime claims. <u>Brennan</u>, 727 F. Supp. 2d at 763. As previously discussed, Murrell has also presented evidence that Wangerin was aware of difficulties that adjusters had completing their assigned tasks within the 40 hour work week. The fact that Murrell has not come forward with Allstate's computer records, which Allstate admits would not demonstrate that Murrell worked overtime, is not availing. <u>See</u>, <u>e.g.</u>, ECF No. 55 at 16-17 (noting that the Allstate computer systems did not provide evidence of hours actually worked). Thus, the Court concludes that it can consider Murrell's affidavit in support of his Motion for Partial Summary Judgment and in opposition to Allstate's Motion for Summary Judgment. In turn, the Court holds that genuine issues of material fact preclude entry of summary judgment on behalf of Allstate on Murrell's claim to recover for the off-the-clock work.

### D. Defamation

In order to prevail on a defamation claim, a plaintiff must establish: "'1) publication, 2) of a defamatory statement, 3) that identifies the plaintiff, 4) that is false, 5) that is published with the

requisite degree of fault, and 6) damages the plaintiff's reputation.'" Farrow v. Saint Francis Med. Ctr., 407 S.W.3d 579, 598-99 (Mo. 2013)(quoting Overcast v. Billings Mut. Ins. Co., 11 S.W.3d 62, 70 (Mo. banc 2000)); Cockram v. Genesco, Inc., 680 F.3d 1046, 1050 (8th Cir. 2012). The degree of fault for liability against a private figure is negligence. Cockram, 680 F.3d at 1052. Murrell alleges that he was defamed when Allstate employees informed its employees that Murrell was terminated for violating Allstate policy and/or falsifying records. (First Amended Complaint, ¶78).

In its Motion for Summary Judgment, Allstate claims that Murrell's claim for defamation fails as a matter of law. First, Allstate asserts that Jenkin's statement to the Unit-V adjusters that Murrell had falsified documents was true and truth is a complete defense to a charge of defamation. (ECF No. 55 at 18-19). Further, Allstate asserts that Murrell has not presented any evidence that he suffered any actual damages due to the alleged defamatory statements. (ECF No. 55 at 19). Allstate states that Murrell has not presented any evidence that other insurance companies did not hire him due to these statements or that other insurance companies were even aware of these allegedly defamatory statements. Allstate also notes that Murrell was hired by Schaefer Auto Body just ten days after his termination. (ECF No. 55 at 19, n.15).

In addition, Allstate contends that even if Murrell could establish a prima facie case of defamation, the statements at issue are not actionable because of the qualified privilege doctrine. (ECF No. 55 at 20). "A communication is qualifiedly privileged when 'it is made in good faith upon any subject-matter in which the person making the communication has an interest or in reference to which he has a duty, and to a person having a corresponding interest or duty.'" Deckard v. O'Reilly Auto., Inc., 31 S.W.3d 6, 16 (Mo. Ct. App. 2000), quoting Rice v. Hodapp, 919 S.W.2d 240, 244 (Mo. banc 1996). Allstate asserts that Jenkins' statement to non-

supervisory personnel was an intra-corporate communication that falls within this qualified privilege. See Rice, 919 S.W.2d at 244 ( "statements to non-supervisory personnel were intra-corporate communications within this qualified privilege"). Allstate contends that "[c]ommunications between the corporation and its personnel are the only means whereby a corporation can inform itself concerning the performances and conduct of employees in the due and regular course of the corporate business." ECF No. 55 at 20 (citing Lovelace v. Long John Silvers, Inc., 841 S.W.2d 682, 685 (Mo.App.1992)); Rice, 919 S.W.2d at 244. Therefore, Allstate asserts that the qualified privilege doctrine bars Murrell's claim for defamation.

In response, Murrell states that after Allstate terminated him and the other adjusters, Jenkins told the other Allstate employees that Murrell had been terminated for "falsifying records." (ECF No. 59 at 20). Murrell claims that those Allstate employees then reported this information to repair shops in the St. Louis area. (Id.) Murrell also asserts that repair shops were told that Murrell was going to receive a large settlement from his lawsuit with Allstate. Murrell states that this misinformation made it harder for Murrell to find work because employers thought that Murrell would not do a good job because he did not need to work. (Id.) Murrell claims that this satisfies all of the requirements for a defamation because: (1) Jenkins made a false statement that Murrell had falsified records, (2) the statement was defamatory in that it claimed that Murrell was incapable of performing his job, (3) the statements identified Murrell by name, and (4) the statement was false because Murrell only followed direct instructions from his superiors regarding his use of "Unknown"; (5) the statements must have been made with malice because Trussell had no reason to discuss Murrell's termination other than malice; and (6) Murrell presented evidence that he has been harmed because repair shops do not take him seriously in negotiating prices. (ECF No. 59 at 21-22). Murrell further asserts that Allstate is not entitled to a

qualified privilege because the communication was not made in good faith, but was done out of malice. (ECF No. 59 at 22).

The Court finds that an issue of fact exists that precludes summary judgment in favor of Allstate. First, as discussed previously regarding Murrell's age discrimination claim, an issue of fact exists regarding whether Murrell was terminated for falsifying records. Likewise, at this stage of the litigation, the Court finds that an issue of fact exists regarding whether Allstate is entitled to a qualified privilege. Further, Murrell has come forward with evidence that he was injured by Allstate's statements because he has had difficulty finding and maintaining employment subsequent to his termination. Thus, because the Court believes that issues of fact preclude summary judgment, the Court denies Allstate's motion as to Murrell's defamation claim in Count V.

### III. Plaintiff's Motion for Summary Judgment

In Murrell's Motion for Partial Summary Judgment, he asks this Court to enter judgment in his favor on Count I for unpaid overtime under the MMWL and on Count III for violations of the FLSA. Murrell maintains that his overtime pay claim is supported by competent evidence. Specifically, Murrell asserts that all four of the former Allstate employees deposed stated that the adjuster job required working hours in excess of forty hours every week. (ECF No. 58 at 4). Murrell also claims that Allstate's NextGen system will confirm that he worked over 40 hours a week. (Id.)[5] Murrell asserts that the Gantt chart (scheduling system) regularly underestimated

---

[5] NextGen is Allstate's overall claim operating system where all components of the claim, including recorded statements, claim diary notes from any Allstate employees who worked the claim, total loss comments, and the actual Audatex estimate are stored. (DSUMF, ¶37). Murrell only uploaded an estimate to NextGen once it was completed, which was not always at the end of the appointment. (DSUMF, ¶35). When a note is made to the claim file in NextGen, the program time stamps the entry. (DSUMF, ¶38). NextGen shows when an adjuster was on the

the time to perform each assignment and, as a result, would schedule more appointments than could be completed during a 40 hour work week. (Id.)  In particular, Murrell states that the Gantt chart and Allstate had no way of knowing in advance if any of the estimates for that day would result in a total loss for the customer's vehicle. (Id.)  Murrell contends that such estimates lasted upwards of an hour and a half and caused an adjuster's work day to run long by several hours. (ECF No. 58 at 4-5).

Second, Murrell asserts that he has presented evidence that he was not paid for overtime work he performed. (ECF No. 58 at 5).  Murrell cites to testimony that Wangerin had to approve all overtime in order for adjusters to be paid for overtime, but that Wangerin was only authorized to allow overtime in certain, preapproved circumstances, such as after a catastrophic hail storm, not day-to-day overtime.

Finally, Murrell asserts that he provided evidence of the amount of hours of overtime he deserves through affidavit which states that he regularly worked 10 hours of uncompensated overtime every week. (ECF No. 58 at 5).  Murrell claims that Allstate made no effort to record the number of hours that adjusters actually worked, even though adjusters routinely complained to Wangerin that they were working overtime. (Id.).  Murrell cites to Donovan v. Tony & Susan Alamo Found., 722 F.2d 397 (8th Cir. 1983) and asserts that it was Allstate's duty to maintain proper records. (ECF No. 58 at 5) (citing Donovan, 722 F.2d at 403-04).  Murrell states that the Court must construe the records against Allstate because it failed to properly keep a record of Murrell's overtime. (ECF No. 58 at 5-6).  In turn, Murrell claims that Allstate has not produced any evidence to refute Murrell's claim of unpaid overtime. (ECF No. 58 at 6).

---

system at a particular point in time; it does not show how long the adjuster was on the system. (DSUMF, ¶39).

In response, Allstate contends that Murrell's purported facts do not establish that he worked in excess of 40 hours per week. (ECF No. 62 at 4). As previously discussed, Allstate argues that the mere fact that adjusters worked in the evening and on Sunday does not establish that they worked overtime. Allstate asserts that adjusters took breaks during the day and otherwise self-regulated their time in order to work their scheduled 40 hour workweek. (Id.) Allstate also notes that Murrell has not come forward with any records to support his statement that Allstate's NextGen system will confirm that he worked Sundays and weeknights. (ECF No. 62 at 5). Indeed, Allstate claims that the NextGen system records can only show when Murrell logged in, not that he was working at that time. (Id.) Allstate argues that the testimony does not reflect that Murrell regularly reported working overtime to Wangerin. Instead, it appears that one of many of the different adjusters brought it up during regular meetings or teleconferences with Wangerin. (ECF No. 62 at 6-7). Finally, Allstate asserts that Murrell's affidavit stating that he worked 50 hours per week should be stricken because he did not provide answers to that effect during discovery. (ECF No. 62 at 8). In the alternative, Allstate claims that an issue of fact exists as to whether Murrell worked overtime. (ECF No. 62 at 9-10).

As previously discussed, the Court finds that an issue of fact exists in this case as to the wage claim. Murrell has come forward with substantial evidence in the form of his own testimony, as well as testimony of other adjusters, that they were refused overtime pay, except in extraordinary circumstances, such as after hail storms. In addition, the Court believes that it can consider Murrell's affidavit in support of his Motion for Summary Judgment. However, construing the evidence in favor of the non-moving party, the Court finds that an issue of fact exists regarding whether and/or to what extent Murrell is entitled to overtime pay. Allstate has come forward with evidence that Murrell was on a self-regulated 40 hour work week. Allstate has also

presented evidence that it paid Murrell overtime on occasion. There are also issues of fact as to whether Murrell reported his overtime to Wangerin and/or Allstate. Based upon the foregoing, the Court finds that issues of material fact exist and the Court denies Murrell's motion for summary judgment on his overtime claims in Counts I and III.

**IV.    Defendant's Motion to Strike Plaintiff's Affidavit in Support of His Motion for Summary Judgment**

On February 14, 2014, Allstate filed a Motion to Strike Plaintiff's Affidavit Submitted in Support of His Motion for Summary Judgment (ECF No. 64). Allstate asserts that Murrell's affidavit contains information that is excludable pursuant to Fed.R.Civ.P. 26(a)(1)(A)(iii), 26(e)(1)(A), and 37(c), as well as the Court's scheduling and trial order. Allstate maintains that throughout discovery it asked Murrell to quantify his claim for unpaid overtime wages, but he failed to do so. (ECF No. 65 at 1).

Allstate maintains that on several occasions Murrell refused to provide any specifics regarding his unpaid overtime claim. In his Rule 26 initial disclosures, Murrell claims that his damages were ongoing and additional discovery would be required to calculate his damages. (ECF No. 65 at 2; ECF No. 65-1). On February 6, 2013, in response to Allstate's interrogatory regarding his damages, Murrell stated, "Unpaid overtime—I am unable to accurately state without the information contained within the Allstate computer system—the Audatex, Next Gen, FPL and email computer system." (ECF No. 65 at 2; ECF No. 65-2). Allstate asked Murrell to describe "the duration of all uncompensated hours worked," Murrell stated, "All actual time worked can be tracked from the Allstate computer system using the Audatex, FPL, NextGen and mainframe and email program. Several days per week, I would talk with a former co-worker, Jess Case, and we would both be working late completing paperwork and call one another with questions regarding completing paperwork." (ECF No 65 at 2; ECF No. 65-2 at 3). On June 5,

2013, in response to a second request for estimated damages, Murrell referred Allstate to his earlier interrogatory response stating that he was unable to calculate his claim for unpaid overtime without computer records from Allstate. (ECF No 65 at 2; ECF No. 65-3 at 9-10).

The Eighth Circuit in Carmody v. Kansas City Bd. of Police Comm'rs, 713 F.3d 401, (8th Cir. 2013) set forth the standard for striking affidavits in circumstances such as this:

> Federal Rule of Civil Procedure 26(a)(1)(A)(iii) requires parties to make initial disclosures, including a computation of damages, which under Rule 26(e)(1)(A) must be supplemented when new information comes to light. The district court has discretion under Rule 37(c)(1) to apply sanctions against a party who has failed to satisfy initial or supplemental disclosure requirements; for example, excluding the evidence or testimony entirely. That "discretion to fashion a remedy or sanction" is "wide," but "narrows as the severity of the sanction or remedy ... increases."

Id. at 404-05 (citing Wegener v. Johnson, 527 F.3d 687, 692 (8th Cir.2008)).

The Court denies the motion to strike Murrell's affidavit. The Court notes that the affidavit is but one piece of evidence in support of Murrell's overtime wage claim. Murrell has provided his testimony, as well as the testimony of other adjusters, who asserted that they were required to perform overtime, complained about working overtime, but were not compensated for this overtime. The Court also notes that Allstate has argued that its computer systems would not be able to demonstrate whether Murrell was working overtime. See, e.g., ECF No. 55 at 17 (noting that even if Murrell entered into Allstate's computer systems a particular time for starting and completing an inspection, that did not mean that he worked on that claim during the entire period of time). Thus, Allstate should not be surprised that Murrell could not come forward with evidence to support his overtime claim based upon Allstate's records. Finally, the Court finds that Allstate has a sufficient remedy for Murrell's alleged noncompliance in disclosing this information: Allstate can cross-examine Murrell regarding his prior discovery responses and his apparent inability to come forward with anything from NextGen or Allstate's other systems to

support his overtime claim. The Court, however, emphasizes that its decision to deny striking Murrell's affidavit is based upon the unique record in this case, particularly the undisputed facts that several adjusters testified that they repeatedly complained that they had to work overtime and Allstate knew that its own records would not be able to verify whether Murrell had worked overtime. Thus, based upon the foregoing, the Court declines to afford Allstate the extreme remedy of striking Murrell's affidavit and denies Allstate's Motion to Strike.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [52] is **GRANTED**, in part, and **DENIED** in part. The Court grants Defendant's Motion for Summary Judgment on Plaintiff's claim for Wrongful Termination in Violation of Public Policy in Count IV of the First Amended Complaint.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment [56] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Strike Plaintiff's Affidavit in Support of His Motion for Summary Judgment [64] is **DENIED**.


Dated this 6th day of August, 2014.


_____
**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**